**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | | |
|---|---|---|
| WILLIAM BOYLE, | ) | |
| | ) | |
| Plaintiff | ) | Civil Action No. |
| | ) | |
| v. | ) | |
| | ) | |
| JANET YELLEN, in her official capacity | ) | |
| As the Secretary of the United States | ) | |
| Department of the Treasury, | ) | |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF THE TREASURY, and | ) | |
| | ) | |
| HIMAMAULI DAS, in his official | ) | |
| capacity as Acting Director of the | ) | |
| Financial Crimes Enforcement Network, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff William Boyle brings this civil action for declaratory and injunctive relief against Janet Yellen, in her official capacity as the Secretary of the United States Department of the Treasury ("Yellen"), the United States Department of the Treasury (the "Treasury"), and Himamauli Das, in his official capacity as Acting Director of the Financial Crimes Enforcement Network ("Das"), and alleges as follows:

### JURISDICTION AND VENUE

1.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States and has jurisdiction to render

declaratory relief because an "actual controversy" exists between the parties within the meaning of 28 U.S.C. § 2201(a).

2.      Venue is proper in this Court under 28 U.S.C. § 1391(e)(3) because no real property is involved, Plaintiff Boyle resides in this District, and Defendants are agencies or officers of the United States sued in their official capacities.

## PARTIES

3.      William Boyle is a citizen of the State of Maine and of the United States and a resident of Cumberland, Maine. Boyle owns 90% of the membership interests of, among other things, Loon Island, LLC, and King Pines, LLC, both of which are limited liability companies created by the filing of documents with the Maine Secretary of State. Both entities own real estate in Gray, Maine.

4.      Defendant United States Department of the Treasury is an executive-branch department of the federal government headquartered in Washington, D.C. responsible for the administration and enforcement of the Corporate Transparency Act, Pub. L. No. 116-283, 134 Stat. 4604, codified at 31 U.S.C. § 5336 (the "CTA" or the "Act"), through the Financial Crimes Enforcement Network ("FinCEN").

5.      Defendant Yellen is the Secretary of the United States Treasury and is named as a party in her official capacity.

6.      Defendant Das is Acting Director of FinCEN and is named as a party in his official capacity.

## FACTS

7.      The CTA is a federal statute enacted on January 1, 2021, as part of the omnibus National Defense Authorization Act for Fiscal Year 2021.[1]

---

[1] William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, 134 Stat. 3388.

8.      Per a final rule issued by FinCEN implementing the CTA on September 29, 2022, the CTA went into effect on January 1, 2024. 87 Fed. Reg. 59498 (Sept. 30, 2022)(codified at 31 C.F.R. § 1010.380).

9.      The stated purpose of the CTA is to combat money laundering, the financing of terrorism, and other illicit activity by making it more difficult for bad actors to hide or benefit from illegal income by using shell companies or similar ownership structures. To that end, the CTA requires most small businesses to report extensive personal ownership information to the federal government.

10.     Specifically, the Act requires "reporting companies" to report the identities of and provide other data regarding their "beneficial owners" to FinCEN. Each of those terms is broadly and ambiguously defined:

- A "reporting company" is defined as a "corporation, limited liability company, or similar entity that is (i) created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe; or (ii) formed under the law of a foreign country and registered to do business in the United States by the filing of a document with a secretary of state or a similar office under the laws of a State or Indian Tribe." 31 U.S.C. § 5336(a)(11)(A).

- A "beneficial owner" is defined as "an individual who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise" (i) "exercises substantial control over the entity;" or (ii) "owns or controls not less than 25 percent of the ownership interests of the entity." *Id.* § 5336(a)(3)(A).

- An "applicant" is defined as any individual who files an application to form a reporting company or "registers or files an application to register" a non-U.S. company to do business in the United States. *Id.* § 5336(a)(2).

11.     By virtue of his ownership of 90% of the membership interests of Loon Island, LLC and King Pines, LLC, Plaintiff Boyle is a "beneficial owner" of at least two "reporting companies" as defined by the CTA. Accordingly, he is subject to the CTA's requirements.

12.     Loon Island, LLC, and King Pines, LLC, own real estate in the State of Maine and engage in exclusively intrastate commerce.

13.     A reporting company must provide to FinCEN personal identifying information for all beneficial owners of the entity, which includes their full legal name, date of birth, current residential or business street address, and "unique identifying number from an acceptable identification document," such as an unexpired passport or State-issued identification card or driver's license, or FinCEN-issued identifier number. *Id.* § 5336(b)(2)(A).

14.     For reporting companies that existed before January 1, 2024, an initial Beneficial Ownership Report containing the aforementioned personal information must be filed "not later than 2 years after the effective date of the regulations" that FinCEN is directed to promulgate. *Id.* § 5336(b)(1)(B).

15.     For reporting companies formed between January 1, 2024 and January 1, 2025, an initial Beneficial Ownership Report must be filed with 90 days of formation or registration.

16.     For reporting companies formed after January 1, 2025, an initial Beneficial Ownership Report must be filed at the time of formation or registration. *Id.* § 5336(b)(1)(C).

17.    If there are any changes to the reported data—such as if a "beneficial owner" or "applicant" moves their personal residence or gets a new driver's license—the entity must provide updated information to FinCEN no later than 30 days after the date on which the change occurred.

18.    Reporting companies that "willfully" fail to comply with the CTA's reporting requirements are subject to a civil penalty of up to $500 per day up to $10,000, two years' imprisonment, or both a fine and confinement. *Id.* § 5336(h)(1), (3). These penalties apply to individuals, like Plaintiff, not reporting entities.

19.    The disclosures required by the CTA will be used to create a vast database of personal information regarding "beneficial owners" and "applicants."

20.    The CTA requires FinCEN to keep the personal data of a reporting company's beneficial owners and applicants for at least five years after the date on which the reporting company is wound down. *Id.* § 5336(c)(1).

21.    The personal information provided to FinCEN may be disclosed to law enforcement agencies, and, with a reporting company's consent, to financial institutions and their regulators.

22.    More specifically, the CTA expressly prohibits disclosure of beneficial ownership information, unless a request for information is properly made by a federal, state, local or tribal governmental agency; foreign governmental agencies; financial institutions subject to federal customer due diligence requirements that has received the reporting company's consent to such a disclosure; the regulators overseeing such financial institutions; or the U.S. Treasury. *Id.* § 5336(c)(2)(B).

23.    If the request for personal data comes from a State, local, or tribal law enforcement agency, the statute requires that "a court of competent jurisdiction . . . has authorized the law enforcement agency to seek the information in a criminal or civil investigation." *Id.* §

5336(c)(2)(B)(i)(II). However, no court authorization is required if the request comes from a "Federal agency engaged in national security, intelligence, or law enforcement activity, for use in furtherance of such activity." *Id.* § 5336(c)(2)(B)(i)(I).

24.     Likewise, a foreign government or non-U.S. law enforcement agency, prosecutor, or judge, acting pursuant to an international treaty, may request certain beneficial owners' or applicant's personal data through a federal agency engaged in national security, intelligence, or law enforcement activity, and FinCEN is authorized to provide such data without any independent examination of the foreign country's need for the information. *See id.* § 5336(c)(2)(B)(ii).

25.     According to FinCEN, the "reporting companies" subject to the CTA will include approximately 32.6 million existing entities in 2024, plus roughly five million additional corporate entities created or registered under State law every year from 2025 to 2035, as well as foreign companies registered to do business in the United States. Beneficial Ownership Information Reporting Requirements for Financial Crimes Enforcement Network (FinCEN), 87 Fed. Reg. at 59549 (2022).

26.     Most small corporations and limited liability companies are considered "reporting companies" under the CTA and are therefore subject to the new reporting requirements.

27.     There are several exceptions, including U.S.-based companies with over 20 full-time employees and annual gross revenue of more than $5,000,000, nonprofit entities, public companies, banking institutions, insurance companies, public accounting firms, public companies, broker dealers, investment funds, money-transmitting businesses, existing shell companies with no foreign owners, assets, or active businesses, and utility companies. 31 U.S.C. § 5336(a)(11)(B).

28.     Despite these broad carve-outs, the CTA does not exempt reporting companies formed solely by U.S. citizens or permanent residents, including small businesses with 20 or fewer full-

time employees and less than $5 million in gross receipts or sales, as well as entities formed for strictly intrastate commerce or non-business purposes such as entities formed to hold a family residence (e.g., a high-profile individual wanting privacy for personal security reasons), entities that are formed with the intent to seek 501(c) federal tax-exempt status but have not yet so (e.g., a small artists' collective), or non-profit entities such as local private social clubs that do not intend to seek 501(c) federal tax-exempt status.

29. The CTA does not provide any limitation on its definition of "reporting companies" based on whether an individual or entity is suspected for a crime or wrongdoing.

30. The CTA does not provide any limitation on its definition of "reporting companies" based on whether the entity is engaging in commercial activity or generating income such as the Internal Revenue Service requires for the reporting of such personal information for tax purposes. Rather, the CTA's requirements are triggered solely by virtue of the "reporting companies" having been formed.

31. Therefore, the CTA's burden will fall substantially and disproportionately on privately-owned small businesses and non-commercial organizations, regardless of whether there is any reason to believe that these small businesses and organizations have engaged in any misconduct whatsoever.

32. The CTA's beneficial owner provisions compel disclosure of Plaintiff Boyle's sensitive personal information to FinCEN, the Treasury Department's criminal enforcement division. These provisions apply solely based on the formation of the real estate holding limited liability companies of which he is the "beneficial owner," regardless of what those companies actually do (or do not do).

33.     Plaintiff Boyle objects to being forced to comply with the Act as an unconstitutional encroachment on the sovereignty of the State of Maine to regulate entity formation. The Supreme Court has held that individual citizens of a State have standing to raise claims that the federal government has infringed on a State's sovereignty. *See Bond v. United States*, 564 U.S. 211, 222 (2011) ("An individual has a direct interest in objecting to laws that upset the constitutional balance between the National Government and the States when the enforcement of those laws causes injury that is concrete, particular, and redressable. Fidelity to principles of federalism is not for the States alone to vindicate.").

34.     To form and register a limited liability company, Maine law requires only the name of the limited liability company and the name of its registered agent, not birthdates, active personal-identification, or any other personal information of its members as the CTA requires. Me. R. S. tit. 13, § 1531(1).  The Act thus requires reporting of data to the federal government above and beyond what Maine currently requires for entity formations.

35.     The benefits of the CTA do not justify the burdens it imposes on business owners like Plaintiff Boyle. To the contrary, the CTA does little to effectively combat financial crime and is inferior to the existing Customer Due Diligence Rule ("CDD Rule").

36.     The CTA was enacted to supplant existing beneficial ownership reporting requirements under the CDD Rule.[2] The existing CDD Rule requires financial institutions to develop and update a risk profile (specifically for anti-money laundering and illicit transaction purposes) for every customer and obtain documentary and verifiable beneficial ownership information, including formation and governance documents, passports, driver's licenses, home addresses, trust

---

[2] See 31 U.S.C § 5318(h) and 31 CFR § 1010.210 for anti-money laundering program requirements, and, as applied to specific financial institutions, in 31 C.F.R. §§ 1020.210, 1021.210, 1022.210, 1023.210, 1024.210, 1025.210, 1026.210, 1027.210, 1028.210, 1029.210, and 1030.210.

agreements, or other information. The information submitted under the CDD Rule is reviewed, vetted, and verified by compliance staff of covered financial institutions (e.g., banks, credit unions, brokers, dealers, and registered investment advisors). Furthermore, these financial institutions have an ongoing obligation to monitor their client relationships and report suspicious activities to FinCEN.

37.     The CTA, on the other hand, requires no supporting documentation, no review of the information, and no third-party monitoring or reporting to FinCEN about suspicious financial activity. Without a disinterested intermediary to make sure that filers are making full and accurate disclosures, bad actors will manipulate or avoid disclosure requirements, undermining the purported purpose of the CTA. The likely result is that the CTA will simply create a database containing personal information about law-abiding reporting companies and their owners who will predominantly be U.S. persons, not the foreign individuals and entities engaging in money laundering and illegal activities that the statute was designed to target.

38.     The CTA effectively transfers responsibility from the very institutions that process the targeted illicit transactions (i.e., big banks, financial institutions, and escrow agents, which are exempted from the CTA's coverage) to small business owners. While Plaintiff fully supports Congress's desire to attack money laundering and terrorism financing, passing a statute that penalizes hard-working U.S. small business owners is not the answer.

## CAUSES OF ACTION

### COUNT ONE

**Unconstitutional Usurpation of the States' Power to Regulate Entity
Formations in Excess of Congress's Constitutional Powers
(U.S. Const. Art. I, amends. IX, X)**

39.     Plaintiff realleges and incorporates by reference each of the Complaint's allegations
stated in paragraphs 1 through 38, above.

40.     States possess the primary sovereign power to charter corporate entities and therefore
have independent authority to regulate the formation and governance of domestic corporations.
*See CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 89 (1987) ("No principle of corporation
law and practice is more firmly established than a State's authority to regulate domestic
corporations.").

41.     The Constitution does not intrude on this power of the States to charter corporations.
*See* 2 M. Farrand, *Records of the Federal Convention of 1787*, at 615-16 (1911) (proposals to grant
powers of incorporation to the federal government at the Constitutional Convention of 1787 were
rejected).

42.     As the Supreme Court made clear in 1819, other than ensuring that State legislatures
did not impair vested colonial-era corporate charters, the Constitution does not vest the federal
government—including Congress and the Treasury Department—with any authority to dictate to
the States the terms under which they charter companies. *See Trustees of Dartmouth College v.
Woodward*, 17 U.S. (4 Wheat.) 518 (1819).

43.     Despite this original constitutional meaning, history, and tradition, the CTA aims to
establish "a clear, Federal standard for incorporation practices," 31 U.S.C. § 5336 note (5)(A),

10

above and beyond what Maine entity laws require. As detailed above, failure to make these disclosures is punishable by fines and imprisonment.

44.     Regulation of corporate formation does not fall within any of the enumerated powers of Congress, including without limitation the power to conduct foreign affairs, the power to regulate foreign, interstate, or Indian commerce, and the taxing power. In addition, such regulation is not "necessary and proper" to the fulfillment of any such enumerated powers.

45.     For example, the formation of a "reporting company" is a purely local act that does not, in and of itself, relate to the conduct of foreign affairs or national security.

46.     Likewise, a "reporting company" has not yet engaged in any foreign, interstate, or Indian commerce at the moment of its formation and does not so engage simply by virtue of being formed.

47.     Additionally, many of the "reporting companies" subject to the Act, including the Maine real estate holding limited liability companies owned by Plaintiff, may never engage in any such foreign, interstate, or Indian commerce as state law permits the formation of a corporate entity for numerous purposes unrelated to commerce, such as local property holding or associational entities like neighborhood organizations and residential housing associations. A large proportion of the CTA's coverage is thus likely to include entities that, like Loon Island, LLC and King Pines, LLC, do not engage in commerce or business at all, or that engage in strictly intrastate commerce (such as residential real property holding) outside the reach of federal regulation.

48.     The CTA therefore does not regulate any specifically identified commercial activity and clearly exceeds Congress's power to regulate interstate, foreign, and Indian commerce.

49.     In addition, the assessment of civil penalties under the CTA does not constitute the levying of a tax. The CTA does not otherwise constitute an exercise of Congress' taxing power.

50.     The CTA commandeers State agencies by coercing States into giving notice to State filers of the CTA's reporting requirements and providing filers with a copy of the CTA filing form. Because the States are the only agents capable of providing notice to entity formation filers at the time of formation, States are likely to feel compelled to provide the notice and the FinCEN filing form to protect their citizens from the severe criminal penalties that would result from failure to comply with the CTA's filing requirements.

51.     Through these requirements, the CTA violates Plaintiff's rights by exceeding the enumerated powers of the federal government set forth in Article I, Section 8 of the Constitution of the United States, violating the Ninth and Tenth Amendments, and violating the constitutional principles of federalism and retained State sovereignty upon which this Nation was founded.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

A.  Declare the CTA to be unconstitutional;

B.  Declare that the CTA exceeds Congress's authority under Article I of the Constitution and encroaches upon the States' respective sovereignties in violation of the Ninth and Tenth Amendments and constitutional principles of federalism and retained State sovereignty;

C.  Enjoin Defendants and any other agency or employee acting on behalf of the United States from enforcing the Act against Plaintiff, and to take such actions as are necessary and proper to remedy their violations deriving from any such actual or attempted enforcement; and

D.  Award Plaintiff his costs and grant such other relief as the Court may deem just and proper.

Dated: March 15, 2024

Respectfully submitted,

*/s/ Daniel L. Rosenthal*

Daniel L. Rosenthal, ME Bar No. 8618
Lee H. Bals, ME Bar No. 3412
K. Blair Johnson, ME Bar 10406

COUNSEL FOR PLAINTIFF

MARCUS|CLEGG
16 Middle Street, Unit 501
Portland, ME  04101
dlr@marcusclegg.com
lhb@marcusclegg.com
kbj@marcusclegg.com
(207) 828-8000