UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| WILLIAM BOYLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:24-cv-00081-SDN |
| | ) | |
| SCOTT BESSENT, | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| THE TREASURY, and | ) | |
| ANDREA GACKI[1] | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

### INTRODUCTION

This case concerns the constitutionality of the Corporate Transparency Act ("CTA"), which requires certain corporate entities to report their beneficial owners to the Department of the Treasury. Plaintiff challenges the CTA on the sole ground that Congress lacked the power to enact it. On stipulated facts, the parties cross-moved for summary judgment. For the reasons that follow, I conclude the CTA is a valid exercise of congressional power. Therefore, I GRANT the government's motion for summary judgment and DENY Plaintiff's cross-motion for summary judgment.

---

[1] Defendants Bessent and Gacki are sued in their official capacities as the Secretary of the United States Department of the Treasury and the Director of the Financial Crimes Enforcement Network, respectively. Defendant Bessent is automatically substituted for former Secretary Janet Yellen. Fed. R. Civ. P. 25(d). Defendant Gacki is automatically substituted for former Acting Director Himamauli Das. *Id.*

## BACKGROUND

### I.    Factual Background

### A.  The Corporate Transparency Act

Federal law prohibits a wide variety of harmful economic activities, including money laundering, mail and wire fraud, financing terrorism, and evading taxes. 18 U.S.C. §§ 1341, 1343, 1956, 2339C; 26 U.S.C. § 7201. To help enforce those prohibitions, federal law also requires some entities and individuals to report relevant information to the government. *See, e.g.*, 12 U.S.C. § 1952 (requiring certain financial institutions to report ownership information); 26 U.S.C. § 7203 (penalizing failure to file a tax return when required to do so); 31 U.S.C. §§ 5313–5316 (requiring financial institutions to report information concerning a wide variety of monetary transactions).

Congress imposed new reporting requirements with the CTA. Passed as part of the Anti Money Laundering Act of 2020 ("AMLA"), itself part of the National Defense Authorization Act for Fiscal Year 2021 ("NDAA"), Pub. L. No. 116-283, 134 Stat. 3388, the CTA requires a significant number of corporate entities to report their ownership information. Congress found the government is often stymied in its efforts to combat financial crime, funding of terrorism, and other illicit activities by shell companies that conceal their true (or "beneficial") owners. Corporations and similar entities generally are formed under state law, and most states do not require companies to disclose their beneficial owners. NDAA § 6402(2). According to Congress, "malign actors" can therefore conceal their activity by using multiple layers of shell companies, "such that each time an investigator obtains ownership records for a domestic or foreign entity, the newly identified entity is yet another corporate entity, necessitating a repeat of the same process." NDAA § 6402(4).

As such, through the AMLA, Congress sought to "(A) improve transparency for national security, intelligence, and law enforcement agencies and financial institutions concerning corporate structures and insight into the flow of illicit funds through those structures; [and] (B) discourage the use of shell corporations as a tool to disguise and move illicit funds," among other goals. NDAA § 6002(5). In furtherance of those objectives, Congress intended "to establish a secure, nonpublic database at FinCEN[2] for beneficial ownership information." NDAA § 6002(6).

To create and maintain that database, the CTA requires each "reporting company" to "identify [to FinCEN] each beneficial owner of the applicable reporting company and each applicant with respect to that reporting company." 31 U.S.C. § 5336(b). A "reporting company" is "a corporation, limited liability company, or other similar entity that is . . . (i) created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe; or (ii) formed under the law of a foreign country and registered to do business in the United States . . . ." *Id.* § 5336(a)(11)(A).

Congress excluded from the definition of "reporting company" over twenty types of entities, including securities issuers, companies formed by interstate compact, banks, brokers or dealers, investment companies, investment advisers, insurance companies, commodities merchants, public accounting firms, public utilities, 501(c) tax-exempt organizations, and political organizations. *Id.* § 5336(a)(11)(B). "Many of these exempt entities are already subject to substantial federal and/or state regulation or already have to provide their beneficial ownership information to a governmental authority." 87 Fed. Reg. at 59539. Congress also exempted entities with more than twenty full-time

---

[2] FinCEN is the Financial Crimes Enforcement Network, the Treasury Department's criminal enforcement division.

employees in the United States that have a physical office in the United States and more than $5 million in gross receipts in the preceding year. 31 U.S.C. § 5336(a)(11)(B)(xxi). Finally, Congress exempted entities that have effectively ceased to operate by excluding from the reporting requirements any entity that has been "in existence for over 1 year," "is not engaged in active business," "is not owned, directly or indirectly, by a foreign person," "has not, in the preceding 12-month period, experienced a change in ownership or sent or received funds in an amount greater than $1,000 (including all funds sent to or received from any source through a financial account or accounts in which the entity, or an affiliate of the entity, maintains an interest)," and "that does not otherwise hold any kind or type of assets, including an ownership interest in any corporation, limited liability company, or other similar entity." *Id.* § 5336(a)(11)(B)(xxiii).

To comply with the CTA, non-exempt reporting companies must disclose their "beneficial owners." A beneficial owner is any individual who, directly or indirectly, "(i) exercises substantial control over the entity; or (ii) owns or controls not less than 25 percent of the ownership interests of the entity," *id.* § 5336(a)(3)(A), but beneficial owners do not include minor children, creditors, or several other exceptions, *id.* § 5336(a)(3)(B). Reporting companies also must disclose "applicants." An applicant is any individual who files the application to form the reporting company or registers the reporting company to do business in the United States. *Id.* § 5336(a)(2).

Reporting companies must disclose the legal name, date of birth, residential or business address, and either a "unique identifying number from an acceptable

identification document" such as a passport or state driver's license, or an identifying number issued by FinCEN at an individual's request.[3] *Id.* § 5336(b)(2).

Though reporting companies must disclose beneficial ownership information to FinCEN, the information is not public. Congress deemed all beneficial ownership information "confidential" and barred any government officer or employee from disclosing the information except on narrow authorized grounds. 31 U.S.C. § 5336(c)(2)(A). For example, FinCEN may disclose beneficial ownership information on request from a federal law enforcement, intelligence, or national security agency, or on request from a state, local, or tribal law enforcement agency when authorized by court order. *Id.* § 5336(c)(2)(B)(i). In limited circumstances, FinCEN also may disclose beneficial ownership information to financial institutions, foreign law enforcement agencies, and federal regulators. *Id.* § 5336(c)(2)(B)(ii)–(iv).

The CTA imposes both civil and criminal penalties for noncompliance. For a "reporting violation[]," such as willfully providing false or fraudulent beneficial ownership information or failing to report beneficial ownership information entirely, a violator is liable for a civil penalty of up to $500 per day the violation continues, and may be fined up to $10,000 and imprisoned for up to two years. *Id.* § 5336(h)(3)(A). For a "disclosure or use violation[]," such as knowingly disclosing or using beneficial ownership information obtained through the CTA's reporting requirements, a violator is liable for the same civil penalty and may be fined up to $250,000 and imprisoned for up to five years. *Id.* § 5336(h)(2), (h)(3)(B). In limited circumstances, a disclosure or use violation

---

[3] Section 5336(b)(3) allows an individual who provides acceptable documentation (such as a passport or driver's license) to thereafter obtain a FinCEN identifying number for the individual to use when updating disclosures—such as when the beneficial ownership of an entity changes—pursuant to § 5336(b)(1)(D).

may be punished by a maximum $500,000 fine and ten years' imprisonment. *Id.* § 5336(h)(3)(B)(ii)(I).

FinCEN (as delegate of the Secretary of the Treasury) promulgated regulations implementing the CTA. FinCEN first issued a Notice of Proposed Rulemaking (the "NPRM"), Beneficial Ownership Information Reporting Requirements, 86 Fed. Reg. 69920 (proposed Dec. 8, 2021), and then enacted a final rule (the "Final Rule"), Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. 59498 (Sept. 30, 2022) (codified at 31 C.F.R. § 1010.380).

The Final Rule requires most preexisting reporting companies to submit reports by January 1, 2025.[4] 31 C.F.R. § 1010.380(a)(1); 31 U.S.C. § 5336(b)(5) (delegating authority to set effective date). However, as explained further below, at present the effective date of the Final Rule is stayed. *See Smith v. U.S. Dep't of the Treasury*, No. 24-CV-336, 2025 WL 41924, at *14 (E.D. Tex. Jan. 7, 2025).

## B. Stipulated Facts

The parties stipulated to the following relevant facts for their cross-motions for summary judgment. ECF No. 17. William Boyle is a citizen of Maine and a resident of Cumberland, Maine. Mr. Boyle owns 90% of the membership interests in Loon Island, LLC, and Kings Pines, LLC, which are both Maine limited liability companies created in 2019. Both Loon Island and Kings Pines own real estate in Gray, Maine. Orchard Hill Estates, LLC is a Maine limited liability company created in September 2023. Mr. Boyle

---

[4] 31 C.F.R. § 1010.380(a)(1) provides various reporting deadlines: Entities created before January 1, 2024, must file their reports by January 1, 2025; entities created during 2024 must file within 90 days after the entity is created; entities created after January 1, 2025, must file within 30 days after the entity is created. As part of the Final Rule, these deadlines presently are stayed. *Smith v. U.S. Dep't of the Treasury*, No. 24-CV-336, 2025 WL 41924, at *2 (E.D. Tex. Jan. 7, 2025).

exercises substantial control over and indirectly owns and controls at least 25% of the ownership interests of Orchard Hill. Orchard Hill previously purchased Mr. Boyle's home and subsequently sold it. Now, Orchard Hill has no assets and does not sell or lease goods, provide services, generate revenue, or otherwise actively engage in commercial transactions.

## II.    Procedural History

Plaintiff sued on March 15, 2024, seeking a declaratory judgment that the CTA is unconstitutional and an injunction preventing the government from enforcing the CTA against Plaintiff. ECF No. 1. On June 7, 2024, the parties filed stipulated facts. ECF No. 17. The government moved to dismiss or for summary judgment on June 14, 2024. ECF No. 18. Plaintiff responded to the motion to dismiss and cross-moved for summary judgment on August 9, 2024. ECF No. 21. The government filed a consolidated reply to Plaintiff's response and a response to Plaintiff's motion for summary judgment on August 28, 2024. ECF Nos. 23–24. Plaintiff replied on September 20, 2024. ECF No. 25. The Court heard oral argument on January 3, 2025. ECF No. 40. The Court thereafter requested supplemental briefing on jurisdictional issues, ECF No. 43, which both parties filed, ECF Nos. 48–49.

While this case pended, other district courts addressed similar constitutional challenges to the CTA. On March 1, 2024, the U.S. District Court for the Northern District of Alabama found the CTA unconstitutional and enjoined the government from enforcing the CTA against the plaintiffs in that case. *Nat'l Small Bus. United v. Yellen (NBSU)*, 721 F. Supp. 3d 1260 (N.D. Ala. 2024). On September 20, 2024, the U.S. District Court for the District of Oregon declined to preliminarily enjoin the CTA in the face of a broad constitutional challenge. *Firestone v. Yellen*, No. 24-CV-1034, 2024 WL 4250192 (D. Or.

Sept. 20, 2024). On October 24, 2024, the U.S. District Court for the Eastern District of Virginia similarly declined to preliminarily enjoin the CTA. *Cmty. Ass'ns Inst. v. Yellen*, No. 24-CV-1597, 2024 WL 4571412 (E.D. Va. Oct. 24, 2024).

On December 3, 2024, the U.S. District Court for the Eastern District of Texas issued a nationwide preliminary injunction barring the government from enforcing the CTA and its implementing regulation, the Final Rule, and stayed the compliance deadline under the Final Rule. *Tex. Top Cop Shop, Inc. v. Garland*, No. 24-CV-478, 2024 WL 4953814 (E.D. Tex. Dec. 3, 2024), *amended and superseded*, 2024 WL 5049220 (Dec. 5, 2024). The government appealed, and on December 23, 2024, a motions panel of the Fifth Circuit stayed the nationwide injunction. *Tex. Top Cop Shop, Inc. v. Garland*, No 24-40792, 2024 WL 5203138 (5th Cir. Dec. 23, 2024). Three days later, the merits panel reinstated the injunction. *Tex. Top Cop Shop, Inc. v. Garland*, No 24-40792, 2024 WL 5224138 (5th Cir. Dec. 26, 2024). On January 23, 2025, the Supreme Court stayed the Eastern District of Texas's order pending disposition of the appeal in the Fifth Circuit. *McHenry v. Tex. Top Cop Shop, Inc.*, No. 24A653, 2025 WL 272062 (U.S. Jan. 23, 2025).

On January 7, 2025, the U.S. District Court for the Eastern District of Texas (in a separate case) again preliminarily enjoined the government from enforcing the CTA and stayed the effective date of the Final Rule. *Smith*, 2025 WL 41924, at *2. The *Smith* injunction applies only to the plaintiffs in that case. *Id.* at *14. However, because staying an agency rule, such as the Final Rule, operates as a "temporary form of vacatur" under the Administrative Procedure Act, the effective date of the Final Rule is stayed

nationwide.[5] *Id.* at *14 (quoting *All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 254 (5th Cir. 2023)).

## ANALYSIS

### I.    Standard of Review

"A grant of summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Viscito v. Nat'l Plan. Corp.*, 34 F.4th 78, 83 (1st Cir. 2022) (quoting *Garcia-Garcia v. Costco Wholesale Corp.*, 878 F.3d 411, 417 (1st Cir. 2017)); Fed. R. Civ. P. 56(a). This case does not involve a genuine dispute of material fact because the parties have stipulated to facts for the purposes of their cross-motions for summary judgment. *Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 677–78 (2010) ("[Factual stipulations are] binding and conclusive . . . , and the facts stated are not subject to subsequent variation." (quoting 83 C.J.S. *Stipulations* § 93 (2000))). This Court therefore may appropriately determine which movant is entitled to judgment as a matter of law. *See Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996) ("Cross motions simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed.").

### II.    Justiciability

This case presents two justiciability problems, which must be addressed at the outset: First, whether Plaintiff suffers an injury-in-fact such that he has standing to bring

---

[5] The Final Rule went into effect on January 1, 2024. *Final Rule*, 87 Fed. Reg. at 59547. Though it may seem odd to speak of "staying" the effective date of a rule already in effect, "[c]ourts—including the Supreme Court—routinely stay already-effective agency action." *Texas v. Biden*, 646 F. Supp. 3d 753, 770 (N.D. Tex. 2022) (gathering cases).

suit. Second, whether Plaintiff has standing to challenge the constitutionality of a law while its implementing regulation is stayed.[6]

"[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*, 958 F.3d 38, 46 (1st Cir. 2020) (quoting *Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 923 F.3d 209, 221 (1st Cir. 2019)). To ensure courts resolve only cases or controversies, "plaintiffs must 'establish that they have standing to sue.'" *Id.* (quoting *U.S. Dep't of Health & Hum. Servs.*, 923 F.3d at 221).

Standing entails three elements: "(1) [A]n injury in fact which is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical,' (2) that the injury is 'fairly traceable to the challenged action,' and (3) that it is 'likely . . . that the injury will be redressed by a favorable decision.'" *Id.* at 47 (quoting *U.S. Dep't of Health & Human Servs.*, 923 F.3d at 221–22).[7]

A plaintiff raising a pre-enforcement challenge to a statute "satisfies the injury-in-fact requirement where [the plaintiff] alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Susan B. Anthony List v.*

---

[6] In their supplemental briefing, both parties agree Plaintiff has standing. And at oral argument, both parties argued the nationwide injunction presented no bar to this Court issuing a decision. However, because standing is jurisdictional, this Court must exercise its "independent obligation to determine whether subject-matter jurisdiction exists." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).

[7] Some courts also refer to the ripeness doctrine as an independent justiciability concern. *See Carman v. Yellen*, 112 F.4th 386, 400 (6th Cir. 2024) (discussing "constitutional and prudential elements" of ripeness). But in most cases "Article III standing and ripeness issues . . . 'boil down to the same question.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 n.5 (2014) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n. 8 (2007)); *see also New Hampshire Lottery Comm'n v. Rosen*, 986 F.3d 38, 52 (1st Cir. 2021) ("In the pre-enforcement context . . . the doctrines of standing and ripeness tend to overlap . . . .").

*Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)). When the plaintiff is the "object of the [government] action . . . there is ordinarily little question that the action or inaction has caused him injury." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992). However, "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Id.* at 562 (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)).

### A. Plaintiff himself is not the object of the CTA's regulation.

The CTA's operative provisions do not require individual beneficial owners such as Plaintiff to take any action on their own. The CTA only requires "each reporting company" to submit beneficial ownership reports. 31 U.S.C. § 5336(b)(1)(A). Because Plaintiff is a person, not a reporting company, he is not required to report beneficial ownership information and is therefore not the object of the CTA.

To be sure, Congress intended the CTA to force reporting companies to disclose the identity of their beneficial owners, including people like Plaintiff. But such an incidental effect on Plaintiff does not make him the object of the statute. For example, in *Doe v. U.S. Attorney General*, the District of Massachusetts found individual sex offender plaintiffs were not the "object" of a federal law incentivizing states to create sex offender registries—even after Massachusetts created such a registry. 657 F. Supp. 2d 315, 318 (D. Mass. 2009).

Because Plaintiff therefore has not been injured as the object of the CTA's regulation, the Court must now examine each element of the injury-in-fact requirement to ensure Plaintiff intends to engage in a course of conduct proscribed by statute and there

exists a credible threat of prosecution for doing so. *Susan B. Anthony List*, 573 U.S. at 159.

### B. Will Plaintiff's companies comply with the CTA?

Plaintiff's companies—Loon Island, Kings Pines, and Orchard Hill—are reporting companies under the CTA because they are limited liability companies created by the filing of documents with the Maine Secretary of State. 31 U.S.C. § 5336(a)(11)(A). Therefore, the CTA requires all three companies[8] to submit beneficial ownership reports. *Id.* § 5336(b)(1)(A).

Though the stipulated facts do not directly indicate whether any of Plaintiff's reporting companies will submit beneficial ownership reports as required by the CTA, the Court considers Plaintiff's allegation that he "objects to being forced to comply" with the CTA as persuasive evidence that Orchard Hill (which Plaintiff substantially controls) will decline to file a beneficial ownership report. ECF No. 1 at 8, ¶ 33.

### C. Is Plaintiff subject to the CTA's penalty provision?

The answer to this question requires a bit of a deep dive. The CTA makes it unlawful for "any person to . . . willfully fail to report" beneficial ownership information "in accordance with subsection (b)." *Id.* § 5336(h)(1). "'[W]illfully' means the voluntary, intentional violation of a known legal duty." *Id.* § 5336(h)(6). Subsection (b), however, imposes a legal duty on every "reporting company" to a report to FinCEN; subsection (b) does not address "persons." *Id.* § 5336(b)(1). The term "reporting company" is narrowly

---

[8] Though Orchard Hill has no assets and does not currently engage in commercial transactions, the stipulated facts do not establish whether Orchard Hill "experienced a change in ownership or sent or received funds in an amount greater than $1,000" thereby exempting it from the definition of a reporting company. 31 U.S.C. § 5336(a)(11)(B)(xxi).

defined and does not include individual persons. 31 U.S.C. § 5336(a)(11).[9] Thus, although the CTA attempts to impose civil and criminal penalties on any "person" who intentionally violates a duty under subsection (b), subsection (b) itself imposes a duty to report only on reporting *companies*, not individuals (or "persons"). *Id.* § 5336(b)(1)(A).

FinCEN recognized this incongruence in the NPRM and Final Rule. *NPRM*, 86 Fed. Reg. at 69944 (explaining "four potential ambiguities" in the penalty provision); *id.* ("While the CTA requires reporting companies to file reports and prohibits failures to report, it does not appear to specify *who* may be liable if required information is not reported." (emphasis added)); *Final Rule*, 87 Fed. Reg. at 59546 ("FinCEN believes that this revised provision reduces potential confusion and provides clarity as to who may be liable . . . ."). *Contra id.* ("[T]he statute is clear regarding who may be held liable for willful violations . . . .").

In an attempt to refine the statute's meaning, the NPRM initially clarified "that a person 'fails to report' complete or updated beneficial ownership information to FinCEN, within the meaning of section 5336(h)(1), if such person directs or controls another person with respect to any such failure to report, *or is in substantial control of a reporting company when it fails to report*." 86 Fed. Reg. at 69944 (emphasis added). As the NPRM explained, the "substantial control" element was "necessary to ensure that companies comply with their obligations." *Id.* "Absent individual liability, malign actors . . . might

---

[9] The word "person" as used in the CTA includes "corporations, companies, associations, firms, partnerships, societies, and joint stock companies," in addition to individuals. 1 U.S.C. § 1; *see* 31 U.S.C. § 5312 (incorporating 1 U.S.C. § 1's definition of "person" into the subchapter encompassing the CTA). Therefore, the *penalty* provisions, under this broad definition of "persons," apply to individuals and reporting companies. However, the *reporting* provisions, which do not use the word "persons," apply to only reporting companies.

otherwise attempt to use the corporate form to insulate themselves from the consequences of their willful conduct." *Id.*

Despite this attempt at clarification, the Final Rule omits the "substantial control" provision of the NPRM. Under the Final Rule, "[a] person fails to report" beneficial ownership information if the reporting company fails to make a required report, and "such person either causes the failure, or is a senior officer of the entity at the time of the failure." 31 C.F.R. § 1010.380(g)(4). The Final Rule intentionally eliminates the NPRM's reference to a person's "substantial control" over a reporting company in the penalty provisions and instead incorporates the concept of a "senior officer." 87 Fed. Reg. at 59546. In doing so, FinCEN believed the Final Rule "reduces potential confusion and provides clarity as to who may be liable for a reporting company's failure to file updates and corrections." *Id.* In particular, FinCEN believed the Final Rule holds people in "specific positions of authority responsible" for a reporting company's violation and "appropriately rest[s] [the] obligation [to report] with those in charge of an entity." *Id.* at 59547·

A "senior officer" within the Final Rule means "any individual holding the position or exercising the authority of a president, chief financial officer, general counsel, chief executive officer, chief operating officer, or any other officer, regardless of official title, who performs a similar function." 31 C.F.R. § 1010.380(f)(8). Curiously, that definition of "senior officer" seems to sweep in those who exercise substantial control over a reporting company—precisely the category of people the Final Rule sought to eliminate from its penalty provisions—because it includes those who "exercise[] the authority" of a senior officer. *Id.* Senior officers definitionally "exercise substantial control." 31 C.F.R. § 1010.380(d)(1)(i). Therefore, an individual exercising substantial control exercises the

same authority as a senior officer, and the Final Rule seems to treat such individuals as senior officers for purposes of the CTA's penalty provision.

The government agrees with this interpretation, arguing that Plaintiff's "ownership and control" over his companies "suggest[s] that he may be a 'senior officer' thereof" under the Final Rule. ECF No. 49 at 3 n.2. Plaintiff likewise relies on the Final Rule to explain how he is subject to the CTA's penalty provisions. ECF No. 48 at 2 n.1 (citing definition of "senior officer"). Plaintiff exercises substantial control over at least one of his companies, Orchard Hill.[10] Therefore, under the Final Rule, he "exercise[es] the authority" of a senior officer of Orchard Hill and is potentially subject to the CTA's penalty provisions, 31 C.F.R. § 1010.380(f)(8), which threaten both civil and criminal penalties, 31 U.S.C § 5336(h)(3).

All this being said, the Court entertains serious doubt as to whether it may rely on the Final Rule to interpret the sweep of the CTA's penalties.

First, the CTA grants the Secretary of the Treasury (and through the Secretary, FinCEN), only limited authority to promulgate regulations under the statute. That authority does not extend to interpretations of the CTA's penalty provisions. Courts

---

[10] The stipulated facts do not establish whether Plaintiff exercises substantial control over Loon Island or Kings Pines, although Plaintiff is a beneficial owner of both. Though a person who exercises substantial control over an entity is a beneficial owner, 31 U.S.C. § 5336(a)(3)(A), a beneficial owner does not necessarily exercise substantial control. After all, a person may be a beneficial owner of an entity by controlling only 25% of the ownership interests, regardless of their role in managing the entity. *Id.* Indeed, Plaintiff cites to a FinCEN compliance guide explaining how some beneficial owners "may not automatically be required, or authorized, to make decisions" for a company. Financial Crimes Enforcement Network, *Beneficial Ownership Information: Small Entity Compliance Guide* 26 (Dec. 2024), https://perma.cc/LPD4-PK73.

Plaintiff urges the Court to take judicial notice of annual reports each of his reporting companies filed with the Maine Secretary of State, which show that he is a "Manager" of each company. Because Plaintiff did not refer to the annual reports in any pleadings, stipulated facts, or filings until his most recent supplemental briefing, and therefore the government has not been afforded the opportunity to contest the reports' authenticity or veracity, the Court declines to take judicial notice thereof.

cannot rely on an agency's interpretation of a statute "merely because the statute is ambiguous and an administrative official is involved." *Gonzales v. Oregon*, 546 U.S. 243, 258 (2006). The Court must probe the "specific respects in which" the agency is "authorized to make rules" before affording a rule's interpretation any deference. *Id.*

The CTA itself does not authorize the Secretary to interpret its penalty provisions. It authorizes the Secretary to determine exemptions from the definition of "reporting company," 31 U.S.C. § 5336(a)(11)(B)(xxiv), to "prescribe procedures and standards governing" reporting requirements, *id.* § 5336(b)(4), to set an effective date, *id.* § 5336(b)(5), to establish protocols to protect the confidentiality of beneficial ownership information, *id.* § 5336(c)(3), and to coordinate with other agencies, *id.* § 5336(d)(3). The CTA also specifically authorizes the Secretary to regulate a safe harbor provision allowing violators to cure reporting defects. *Id.* § 5336(3)(C)(i)(I)(bb). But the CTA does not authorize the Secretary to interpret who is covered by the penalty provisions. Nor does the CTA, or any part of the AMLA, grant the Secretary "broad power to enforce all provisions of the statute." *Gonzales*, 546 U.S. at 258. Therefore, the Court may not consider the Final Rule's interpretation of the CTA's penalty provisions because the statute does not authorize an agency interpretation of these provisions.

Second, even if the CTA authorized the Secretary to interpret the penalty provision, courts may not defer wholesale to an agency's interpretation of an ambiguous statute. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 413 (2024). Courts may continue to "seek aid from the interpretations of those responsible for implementing particular statutes," to the extent those interpretations, reflected in a rule, "constitute a body of experience and informed judgment." *Id.* at 394 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). And if a (properly authorized) rule is ambiguous, courts may rely

on an agency's interpretation of the rule it promulgated. *Kisor v. Wilkie*, 588 U.S. 558, 573 (2019).

Here, the Court is not convinced the Final Rule persuasively interprets the CTA's penalty provision, even if it was authorized to do so. While the provision plainly imposes penalties on reporting companies that do not file beneficial ownership reports, the same cannot be said of individuals. 31 U.S.C. § 5336(h)(1) ("It shall be unlawful for any person [which includes reporting companies] to . . . willfully fail to report [beneficial ownership information] in accordance with subsection (b)."). As stated above, subsection (b) imposes a legal duty on every "reporting company" (which by definition does not include persons, *id.* § 5336(a)(11)) to file a report. *Id.* § 5336(b)(1). Subsection (b) does not address "persons" at all. A plain reading of the statute, therefore, demonstrates that an individual person cannot be liable under the penalty provision because an individual person is not duty-bound to file a report under subsection (b). The Final Rule therefore purports to impose liability on senior officers—persons—who would by the language of the statute itself otherwise fall outside the statutory penalty's scope.

Third, even if the Court were persuaded by the Final Rule's purported interpretation of the penalty provisions, it is not clear the Court may "seek aid" from such interpretation because the penalty provisions contain criminal as well as civil sanctions. *Loper Bright*, 603 U.S. at 405 ("[W]e have sent mixed signals on whether *Chevron* applies when a statute has criminal applications."); *Babbitt v. Sweet Home Chapter of Communities for a Great Or.*, 515 U.S. 687, 704 (1995) (hypothesizing "regulations whose interpretations of statutory criminal penalties provide such inadequate notice of potential liability as to offend the rule of lenity"). The Court is bound to strictly construe criminal statutes. "[T]he canon of strict construction of criminal statutes, or rule of lenity, ensures

17

fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered." *United States v. Lanier*, 520 U.S. 259, 266 (1997); *Crandon v. United States*, 494 U.S. 152, 168 (1990) ("To the extent that any ambiguity over the [statute's] scope . . . remains, it should be resolved in the [defendant's] favor unless and until Congress plainly states that we have misconstrued its intent.").

For these reasons, the Court is skeptical that Plaintiff is properly subject to the CTA's civil or criminal penalties. Nonetheless, the final prong of the analysis shows Plaintiff has standing to challenge the CTA.

### D. Plaintiff faces a credible threat of prosecution.

The Court finds Plaintiff has standing because Plaintiff faces a credible threat of prosecution. Whether the threat of prosecution is credible turns on whether the plaintiff has an "'objectively reasonable' fear of prosecution." *R.I. Ass'n of Realtors, Inc. v. Whitehouse*, 199 F.3d 26, 31 (1st Cir. 1999). The Court must consider the totality of the circumstances in so determining. *Id.*

Here, FinCEN promulgated rules indicating its (perhaps ultimately incorrect) belief that individuals like Plaintiff are subject to the CTA's penalty provisions. FinCEN published guidance for businesses stating the same. Financial Crimes Enforcement Network, *Beneficial Ownership Information: Small Entity Compliance Guide* 26 (Dec. 2024), https://perma.cc/LPD4-PK73 ("Senior officers of an entity that fails to file a required [beneficial ownership] report may be held accountable for that failure."); *id.* ("[A] person may be subject to civil and/or criminal penalties for willfully causing a company not to file a required [beneficial ownership] report . . . ."). And the government maintains in this litigation that Plaintiff would be liable under the CTA penalty provision, as does Plaintiff.

18

The First Circuit has found standing even when the government itself expresses uncertainty as to a statute's application in a particular case. *N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38, 52 (1st Cir. 2021); *R.I. Ass'n of Realtors, Inc.*, 199 F.3d at 31. The Court sees no reason the same should not be true when it is the Court that entertains doubts as to a statute's application (particularly where, it bears repeating, the government does not share the Court's doubt). After all, pre-enforcement standing only requires a threat of *prosecution*, not a threat of conviction. *N.H. Hemp Council, Inc. v. Marshall*, 203 F.3d 1, 5 (1st Cir. 2000) ("[J]ust how clear the threat of prosecution needs to be turns very much on the facts of the case and on a sliding-scale judgment that is very hard to calibrate."); *cf. Aroostook Band of Micmacs v. Ryan*, 404 F.3d 48, 71 (1st Cir. 2005) ("Even assuming that the EEOC immediately agrees with the [plaintiffs] and dismisses each case, repeatedly forcing the [plaintiffs] to defend obviously futile Title VII complaints makes it incur financial costs that qualify as a cognizable injury."), *overruled on other grounds by Narragansett Indian Tribe v. Rhode Island*, 449 F.3d 16 (1st Cir. 2006). In this case, there is no "reason to doubt the government's zeal" in enforcing the CTA against Plaintiff. *Marshall*, 203 F.3d at 5.

One small hurdle on standing remains. The Final Rule setting an effective date of the CTA is stayed. *Smith*, 2025 WL 41924, at *4. The government may not, at this precise moment, attempt to enforce the CTA against Plaintiff as the CTA's reporting requirements are not in effect. It remains possible that the stay will not be lifted, and the reporting requirements will never go into effect. Nonetheless, because the stay in *Smith* is preliminary, the Court finds a credible threat of prosecution remains.

The procedural history of *Texas Top Cop Shop* highlights the ephemeral nature of such preliminary stays. After the Eastern District of Texas enjoined the CTA and stayed

the Final Rule, the Fifth Circuit stayed the injunction. Only three days later, the Fifth Circuit vacated its prior order in part, thereby reinstating the injunction. Most recently, the Supreme Court vacated the injunction and stay. *McHenry v. Tex. Top Cop Shop, Inc.*, No. 24A653, 2025 WL 272062 (U.S. Jan. 23, 2025).

Plaintiff need not show that prosecution is a mathematical certainty to have standing at the pre-enforcement stage. When standing rests on an allegation of future injury, such injury must be "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). But in the pre-enforcement context, the injury is the present threat of (future) prosecution. Were plaintiffs required to show prosecution is certain, pre-enforcement challenges would categorically fail because prosecutors may, for a multitude of reasons, decline to prosecute any particular person. It is objectively reasonable to believe that the government will enforce the CTA against Plaintiff if *Smith*'s stay is lifted. The Court therefore finds Plaintiff faces a credible threat of prosecution and has standing to bring this challenge.

Because Plaintiff has standing for the reasons described above, the Court does not address Plaintiff's other arguments for standing.

### III.    Constitutionality of the CTA

The Constitution expressly enumerates congressional power. In doing so, the Constitution "presupposes something not enumerated." *Gibbons v. Ogden*, 9 Wheat. 1, 195 (1824). Therefore, "the Federal Government 'can exercise only the powers granted to it.'" *Nat'l Fed'n of Indep. Bus. v. Sebelius (NFIB)*, 567 U.S. 519, 534–35 (2012) (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 405 (1819)). "If no enumerated power authorizes Congress to pass a certain law, that law may not be enacted . . . ." *Id. at* 535.

The government "must show that a constitutional grant of power authorizes each of its actions." *Id.* The government posits four sources of constitutional authority for the CTA. First, it argues the Commerce Clause, which grants Congress the power to "regulate Commerce with foreign Nations, and among the several States," authorizes the CTA. U.S. Const. art. I, § 8, cl. 3. Second, it argues that Congressional and Presidential authority to regulate foreign affairs and address national security concerns separately supports the CTA because the CTA helps counter international money laundering and financing of terrorism. Third, it argues Congress's power to lay and collect taxes, U.S. Const. art. I, § 8, cl. 1, authorizes the CTA because the CTA facilitates tax collection. Fourth, it argues the Necessary and Proper Clause, U.S. Const. art. I § 8, cl. 18, grants Congress the power to enact "laws that are 'convenient, or useful' or 'conducive' to the [enumerated] authority's 'beneficial exercise.'" *United States v. Comstock*, 560 U.S. 126, 133–34 (2010) (quoting *McCullough*, 17 U.S. (4 Wheat.) at 413, 418). The government posits under any enumerated power, the CTA need only be "rationally related to the implementation of a constitutionally enumerated power." *Id.* at 134.

## A.  Facial Challenge Standard

Litigants can raise two types of constitutional challenges to a duly enacted statute. First, a litigant may claim that a statute is unconstitutional "as applied" to the circumstances of their case. *See United States v. Barnard*, 704 F. Supp. 3d 259, 265 (D. Me. 2023). Second, a litigant may claim that a statute is unconstitutional "on its face." Generally, to succeed on a facial challenge, a litigant "must establish that no set of circumstances exists under which the [statute] would be valid," *United States v. Salerno*, 481 U.S. 739, 745 (1987), or that "the statute lacks any 'plainly legitimate sweep,'" *Hightower v. City of Boston*, 693 F.3d 61, 77–78 (1st Cir. 2012) (quoting *United States v.*

*Stevens*, 559 U.S. 460, 472 (2010)). A facial challenge therefore usually is "hard to win." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024).

Indeed, when a litigant claims a statute infringes on an individual right, courts favor as-applied challenges because "'[c]laims of facial invalidity often rest on speculation' about the law's coverage and its future enforcement." *Id.* (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)). Otherwise, faced with uncertainty as to a law's sweep, a court considering a facial challenge might "'short circuit the democratic process' by preventing duly enacted laws from being implemented in constitutional ways." *Id.* (quoting *Wash. State Grange*, 552 U.S. at 451).

However, when a litigant challenges a law as going beyond Congress's enumerated powers rather than infringing on an individual right, "the continuing vitality of the *Salerno* standard is unclear." *United States v. Shields*, 522 F. Supp. 2d 317, 335 (D. Mass. 2007). This is because the very nature of an enumerated powers argument effectively collapses any distinction between facial and as-applied challenges. If Congress wholly lacks constitutional power to enact a statute, the Executive Branch's choice to enforce the statute against a particular litigant can't provide authorization the Constitution does not. The Constitution either provides Congress the authority to enact the statute or it doesn't, and courts must decide where the "federal power . . . stops." *Haaland v. Brackeen*, 599 U.S. 255, 276 (2023).

Nonetheless, the doctrine remains unsettled. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010) ("[T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect . . . ."). In *Gonzales v. Raich*, for example, the Court upheld the Controlled Substances Act as a facial matter under the Commerce Clause, even though the litigants sought to frame their challenge as

applied to their particular circumstances. 545 U.S. 1, 15 (2005). When it comes to enumerated powers claims, the Court explained, courts may not "excise individual applications of a concededly valid statutory scheme." *Raich*, 545 U.S. 23. But in *Katzenbach v. McClung*, the Court upheld the public accommodations provisions of the Civil Rights Act as applied to a particular restaurant. 379 U.S. 294 (1964). Once the Court found the Commerce Clause empowered Congress to regulate retail activities "which directly or indirectly burden or obstruct interstate commerce," *id.* at 383, "[t]he only remaining question . . . [was] whether the *particular* restaurant" operated in interstate commerce, *id.* at 303–04 (emphasis added).

Recently, the Supreme Court has characterized the distinction between facial and as-applied challenges as a question of remedies. *See Citizens United*, 558 U.S. at 331. The remedy for an as-applied challenge is narrow; the remedy for a facial challenge is broad. But the choice of a facial or as-applied challenge "does not speak at all to the substantive rule of law necessary to establish a constitutional violation." *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019). "Surely it would be strange for the same words of the Constitution to bear entirely different meanings depending only on how broad a remedy the plaintiff chooses to seek." *Id.*

Here, Plaintiff seeks a declaratory judgment that the CTA is unconstitutional, which suggests a facial challenge. ECF No. 1 at 12. Plaintiff also seeks injunctive relief preventing the government from enforcing the CTA against Plaintiff, which suggests an as-applied challenge *Id.* The government treats Plaintiff's challenge as facial, arguing Plaintiff must show "no set of circumstances exists under which the [CTA] would be valid." ECF No. 18 at 10 (quoting *Salerno*, 481 U.S. at 745). The government contends the fact that at least two of Plaintiff's companies are commercially active dooms his challenge.

For the reasons described, the Court is not convinced this analysis is compatible with an enumerated powers challenge because it risks altering the substantive rule of analysis, *Buckley*, 587 U.S. at 138, and fails to answer the question of whether the CTA forms a "valid statutory scheme," *Raich*, 545 U.S. 23. However, the Court need not resolve this issue definitively, because, for the reasons explained below, the Court finds the CTA is valid facially and as applied to Plaintiff.

### B.  Commerce Clause

The Commerce Clause grants Congress broad authority "to regulate commerce with foreign nations, among states, and with the Indian tribes." U.S. Const. art. I, § 8, cl. 3; *NFIB*, 567 U.S. at 549 (opinion of Roberts, C.J.). The power to regulate commerce includes the power to "enact 'all appropriate legislation' for its 'protection or advancement'; to adopt measures 'to promote its growth and insure its safety'; 'to foster, protect, control, and restrain.' That power is plenary and may be exerted to protect interstate commerce 'no matter what the source of the dangers which threaten it.'" *N.L.R.B. v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37 (1937) (citations omitted).

Under its Commerce Clause power, Congress may regulate "activities that substantially affect interstate commerce."[11] *United States v. Lopez*, 514 U.S. 549, 559 (1995). Such activities "may be regulated so long as they substantially affect interstate commerce in the aggregate, even if their individual impact on interstate commerce is minimal." *Taylor v. United States*, 579 U.S. 301, 306 (2016). Courts need only determine whether there is a "rational basis" to conclude the activities substantially affect interstate commerce, not whether the activities substantially affect interstate commerce "in fact."

---

[11] Because I conclude the CTA is valid under the substantial effects test, I do not address the government's alternative Commerce Clause theories.

*Hernandez-Gotay v. United States*, 985 F.3d 71, 78 (1st Cir. 2021) (quoting *Raich*, 545 U.S. at 22). To aid that analysis, the First Circuit has instructed courts to consider four factors:

> (1) whether the statute regulates economic or commercial activity; (2) whether the statute contains an "express jurisdictional element" that limits the reach of its provisions; (3) whether Congress made findings regarding the regulated activity's impact on interstate commerce; and (4) whether "the link between [the regulated activity] and a substantial effect on interstate commerce was attenuated."

*United States v. Morales-de Jesus*, 372 F.3d 6, 10 (1st Cir. 2004) (quoting *Morrison*, 529 U.S. at 610–12).

       1.  <u>Regulates Economic or Commercial Activity</u>

Since at least the early 1900s, the Supreme Court's Commerce Clause jurisprudence has depended on "practical" considerations, *NFIB*, 567 U.S. at 555, and rejected "technical inquiry," *United States v. Lopez*, 514 U.S. 549, 572 (1995) (Kennedy, J., concurring) (quoting *Stafford v. Wallace*, 258 U.S. 495, 519 (1922)). The judicial understanding of congressional power has "evolved over time," and therefore courts must avoid viewing the Supreme Court's Commerce Clause cases "in isolation" when "assessing the validity of congressional regulation." *Raich*, 545 U.S. at 15–16.

The "most far reaching example of Commerce Clause authority over intrastate activity," *Lopez*, 514 U.S. at 560, is the seminal case of *Wickard v. Filburn*, 317 U.S. 111 (1942). In *Wickard*, the Supreme Court upheld a statute limiting the amount of wheat a farmer could grow each year. *Id.* at 128–129. The farmer, who grew excess wheat for personal consumption only, argued he acted outside the market and therefore had no effect on interstate commerce. *Id.* at 119. The Court rejected that argument, holding that purely local activity may still "be reached by Congress if it exerts a substantial economic

effect on interstate commerce." *Id.* at 125. As the Court later explained, growing wheat, even for personal consumption, is economic activity. *Lopez*, 514 U.S. at 560. That's because home-grown wheat can only go two places, and both have economic effect: First, wheat can "flow into the market" itself, thereby affecting commerce directly. *Wickard*, 317 U.S. at 128. Second, if home-grown wheat "supplies the need of the [person] who grew it," it displaces the open market, thereby affecting commerce more indirectly. *Id.* Therefore, whether the effect is "direct" or "indirect" does not alter the analysis. *Id.* at 125. In either manner, growing wheat at home is an "economic enterprise." *Lopez*, 514 U.S. at 561. Indeed, doing so is "quintessential economic activity." *Raich*, 545 U.S. at 20.

In *United States v. Lopez*, the Supreme Court struck down the Gun-Free School Zones Act, which prohibited carrying a firearm in a school zone. 514 U.S. 549 (1995). The Court held the statute "neither regulates a commercial activity nor contains a requirement that the possession [of a firearm in a school zone] be connected in any way to interstate commerce." 514 U.S. at 551. While other activities, such as coal mining, credit transactions, operating restaurants, hotels, and inns, and growing wheat, are all economic in nature, *id.* at 559–560 (gathering cases), possession of a gun in a school zone involves no economic or commercial activity whatsoever, *id.* at 561. Because the statute did not regulate an underlying economic activity, the Court held the effect of those activities could not be aggregated into a "substantial effect" on interstate commerce. *Id.*

The Court reaffirmed its commitment to this framework in *United States v. Morrison*, which struck down a portion of the Violence Against Women Act. 529 U.S. 598 (2000). Highlighting the central role "the economic nature of the regulated activity plays in . . . Commerce Clause analysis," *id.* at 610, the Court held that "[g]ender-motivated crimes of violence are not, in any sense of the phrase, economic activity," *id.* at 613.

26

Though such violence may affect interstate commerce—albeit through a too-"attenuated" chain of causation, *id.* at 615—violent crimes themselves are not commercial or economic.

The common principle of *Lopez* and *Morrison* is that the regulated activity must be economic in nature as a prerequisite to considering whether such activity substantially affects interstate commerce in the aggregate.[12] This prevents the government from asserting nearly unlimited power over areas with dubious commercial character, such as child custody disputes. *Lopez*, 514 U.S. at 564. On the other hand, when Congress regulates economic activity, the Commerce Clause power remains "vast." *NFIB*, 567 U.S. at 554. And that power, when exercised through regulation of economic activity, is not limited even if it intrudes on "areas of traditional state regulation." *Morrison*, 529 U.S. at 615; *United States v. Darby*, 312 U.S. 100, 114 (1941) ("It is no objection to the assertion of the power to regulate interstate commerce that its exercise is attended by the same incidents which attend the exercise of the police power of the states."); *see Lopez*, 514 U.S. at 580 (Kennedy, J., concurring) (explaining that courts "must inquire whether the exercise of national power seeks to intrude upon an area of traditional state concern" only when "neither the actors nor their conduct has a commercial character").

*Gonzales v. Raich* demonstrates this principle. 45 U.S. 1 (2005). In *Raich*, the Court rejected a challenge to the Controlled Substances Act's prohibition on purely intrastate possession and manufacture of marijuana for personal use. In doing so, the Court distinguished between "commercial" and "economic" activity. Growing marijuana

---

[12] Though *Morrison* declined to adopt a "categorical rule against aggregating the effects of any noneconomic activity," the Court has upheld regulations under the Commerce Clause only in cases where the underlying activity is economic in nature. *Morrison*, 529 U.S. at 613. While *Wickard* referenced the possibility that intrastate activity may be aggregated "whatever its nature," the activity of growing wheat is decidedly economic. 317 U.S. at 125.

or other crops for personal consumption may not be "'commercial,' in that [the crops are] not produced for sale," but doing so remains "quintessential economic activity," *Raich*, 545 U.S. at 18, 20 (discussing *Wickard*, 317 U.S. 111), because it involves the production, distribution, and consumption of a commodity, *id*. at 26. Indeed, there is an "established, albeit illegal, interstate market" for marijuana. *Id*. at 18. The majority in *Raich* was unconcerned that the Controlled Substances Act regulated an area typically reserved for state power—the administration of criminal law. *See Lopez*, 514 U.S. at 561 n.3; *Raich*, 545 U.S. at 66 (Thomas, J., dissenting) (criticizing the CSA's encroachment "on States' traditional police powers to define the criminal law").

Harmonizing the holdings in these cases demonstrates why the CTA regulates economic or commercial activity—the prerequisite to considering whether or not such activity substantially affects interstate commerce in the aggregate. The existence of a corporate entity is "in any sense of the phrase, economic activity." *Morrison*, 529 U.S. at 613. A "practical" view of corporate existence shows that corporate entities are decidedly commercial in nature. *Id*. at 611 (quoting *Lopez*, 514 U.S. at 573 (Kennedy, J., concurring)). Corporations do things with readily "apparent commercial character." *Morrison*, 529 U.S. at 611 n.4. They own property and conduct business. *See, e.g*., 31 M.R.S.A. § 1505 (2024). They vest their owners with transferrable shares, protect their owners through limited liability, and protect themselves through entity shielding—all traits tailored to the exercise of commercial activity. *See generally* Henry Hansmann et. al., *Law and the Rise of the Firm*, 119 Harv. L. Rev. 1333 (2006). The Supreme Court recognized this reality over two centuries ago:

> [Corporations are] a means by which other objects are accomplished. No contributions are made to charity, for the sake of an incorporation, but a corporation is created to administer the charity; no seminary of learning is

instituted, in order to be incorporated, but the corporate character is
conferred to subserve the purposes of education.

*McCulloch*, 17 U.S. (4 Wheat.) at 411. In other words, corporations exist "for the purpose
of effecting something else." *Id.*

Moreover, the mere existence of a corporate entity—even one engaging in no
commercial transactions with no assets to its name—has concrete economic value. For
example, some corporate servicing firms create so-called "shelf companies," which are
expressly designed to sit dormant for years. *See* Nathan Wadlinger et. al., *Domestic Asset
Tracing and Recovery of Hidden Assets and the Spoils of Financial Crime*, 49 St. Mary's
L.J. 609, 631 (2018). The shelf company develops a corporate history simply by existing,
which in turn lends the entity credibility. Kelly Carr & Brian Grow, *Special Report: A little
house of secrets on the Great Plains*, Reuters (June 28, 2011), https://perma.cc/L3F8-
CZ5B. A buyer can then purchase the shelf company, sometimes for thousands of dollars.
The older the shelf company, the higher the value. *Id.*; *see also Final Rule*, 87 Fed. Reg.
at 59499 (describing an individual in Florida who used shell companies "created years
earlier" to fraudulently obtain $24 million in COVID-19 relief funds). Just by existing, a
corporate entity accrues measurable economic value.

Comparing the case at hand to *Lopez* and *Morrison* further supports the
conclusion that the CTA regulates economic or commercial activity; a corporate entity has
far more commercial character than possession of a firearm or interpersonal violence. A
firearm can be used for a variety of purposes—say, hunting or self-defense—but there is
nothing intrinsically economic or commercial about possessing one. *Lopez*, 514 U.S. at
561. It is an item of property like any other. Likewise, interpersonal violence lacks any

29

innate economic character. *See Morrison*, 529 U.S. at 617. To put it another way, "[t]here are no markets for [those] activities." *Morales-de Jesus*, 372 F.3d at 12.

Reporting companies regulated by the CTA are far more akin to the commercial farm regulated in *Wickard* or the local marijuana operation of *Raich* than the activities at issue in *Lopez* and *Morrison*. *See Wickard*, 317 U.S. at 128 (noting homegrown wheat tends to actually "flow into the market"); *Raich*, 545 U.S. at 18 (highlighting the "established . . . interstate market for marijuana"). Corporate entities not only participate in interstate markets as businesses[13] but are traded in interstate markets as assets. *See e.g.*, *Wyo. Corp. Servs. v. CNBC, LLC*, 32 F. Supp. 3d 1177, 1186 & n.3 (D. Wyo. 2014) (finding "substantially true" statements that one Wyoming company offered hundreds shelf companies for sale ); *NML Cap., Ltd. v. Republic of Argentina*, No. 14-CV-1573, 2015 WL 1186548, at *1, *3 (D. Nev. Mar. 16, 2015) (describing a Nevada corporation that contracted with a law firm itself "known for incorporating shell companies and laundering money," to create shelf corporations "in various jurisdictions worldwide"); *see also* Wadlinger et al., *supra*, at 631. Therefore, by regulating corporate entities through reporting requirements, the CTA regulates economic or commercial activity.

Plaintiff further posits the CTA fails because it does not regulate "actual commercial activity," only "prophesied future activity." ECF No. 21 at 14 (quoting *NFIB*,

---

[13] Plaintiff focuses largely on dormant entities that own no assets and make no transactions for his position that the CTA is not regulating activities that substantially affect interstate commerce. While such entities undoubtedly exist, it bears noting that Congress found more than 2 million corporate entities are formed *each year*. NDAA § 6402(1). Notwithstanding the fact that even dormant companies can have an economic effect, as discussed above, it strains credulity to imagine that any significant portion of the 2 million entities formed each year will exist perpetually without engaging in commercial transactions. Moreover, that a statute "ensnares some purely intrastate activity is of no moment," *Raich*, 545 U.S. at 22, even if some of the activity is non-economic. The Court cannot "excise individual components of [a] larger scheme" that otherwise validly regulates economic activity with a substantial effect on interstate commerce. *Id.*

567 U.S. at 557). That is, according to Plaintiff, even if the CTA regulates *something* economic in nature, the thing the CTA regulates is "inactivity rather than activity." *NFIB*, 567 U.S. at 556.

To be sure, Congress lacks the power to "compel" commerce, *id.* at 555, but the CTA does no such thing. The CTA requires reporting companies to report beneficial ownership information at various stages in a corporation's existence;[14] it does not force reporting companies to participate in a particular market for goods or services. *Id.* at 557. Filing a report is not like purchasing health insurance. While the statute in *NFIB* attempted to regulate individuals' failure to purchase insurance (a form of inactivity) by compelling those individuals to purchase insurance (thereby forcing them to engage in commercial activity), *NFIB*, 567 U.S. at 548–49, the CTA regulates corporate entities' creation and existence (a form of activity) by merely requiring them to file reports on that creation and existence (which, as described above, is already commercial activity), *see Elec. Bond & Share Co. v. Sec. & Exch. Comm'n*, 303 U.S. 419, 437 (1938) ("[Federal] [r]egulation requiring the submission of information is a familiar category."); *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 47 (1974) ("[P]rovisions requiring reporting or recordkeeping . . . are by no means unique."). The statute in *NFIB* compelled new economic activity, while the CTA regulates extant activity through traditional information-gathering.

Finally, though Plaintiff emphasizes the purportedly non-commercial nature of his own companies, it is not clear to the Court that any of Plaintiff's entities are in fact

---

[14] Existing reporting companies must file reports once the CTA takes effect, new reporting companies must file reports at formation or when their beneficial ownership changes, and exempt reporting companies must file reports if they cease to be exempt. 31 U.S.C. § 5336(b).

dormant. Plaintiff highlights the government's suggestion that Loon Island and Kings Pines "can" own real estate, ECF No. 25 at 6 ("The operative word in this statement is 'can' . . . [and] Commerce Clause authorized regulation cannot be based on a 'prophesied future activity.'"), yet ignores the stipulated fact that Loon Island and Kings Pines actually do own real estate. ECF No. 17 at 2, ¶ 4; *cf. Russell v. United States*, 471 U.S. 858, 862 (1985) (recognizing "that the local rental of an apartment unit is merely an element of a much broader commercial market in rental properties"). Similarly, while Orchard Hill no longer owns any assets or engages in commercial transactions, the stipulated facts establish that Orchard Hill bought and sold Plaintiff's home—surely a commercial activity. ECF No. 17 at 2, ¶ 7. Nothing in the record indicates how long ago Orchard Hill divested its last asset or conducted its last transaction. That all of Plaintiff's companies have engaged in real estate transactions only highlights the intrinsically economic and commercial nature of corporate entities.

### 2.  Express Jurisdictional Element

The Supreme Court has held that an express jurisdictional hook limiting a statute's provisions to interstate conduct "may establish that the enactment is in pursuance of Congress' regulation of interstate commerce." *Morrison*, 529 U.S. at 612. However, though a jurisdictional element may "'ensure' constitutionality," it is not a "prerequisite of constitutionality." *United States v. Wilson*, 73 F.3d 675, 685 (7th Cir. 1995). Therefore, "even a complete absence of a jurisdictional element in the text of a statute is not fatal to a statute challenged on Commerce Clause grounds." *Morales-de Jesus*, 372 F.3d at 14. Without a jurisdictional element, "courts must determine independently whether the statute regulates activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affect[] interstate commerce."

*Id.* (quoting *Rancho Viejo, LLC v. Norton*, 323 F.3d 1062, 1068 (D.C. Cir. 2003)). Thus, although the CTA has no jurisdictional element limiting its scope to activities affecting interstate commerce, so long as the statute regulates economic activities substantially affecting interstate commerce in the aggregate, which it does, this omission is not fatal.

### 3. Congressional Findings

Like the jurisdictional element, Congress need not make express findings regarding the effect of the regulated activity on interstate commerce for the statute to survive review. *Lopez*, 514 U.S. at 562. Nor is the existence of congressional findings "sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation." *Morrison*, 529 U.S. at 614. Such findings merely "help[] the Court evaluate the impact of the activity on interstate commerce 'even though no such substantial effect [is] visible to the naked eye.'" *Morales-de Jesus*, 372 F.3d at 9 (quoting *Lopez*, 514 U.S. at 563).

Congress made express findings as to the interstate character of the activity the CTA regulates. First, Congress found that "more than 2,000,000 corporations and limited liability companies are being formed" each year, most of which need not disclose their beneficial ownership information. NDAA § 6402(1)–(2). Second, Congress found that "money launderers and others involved in commercial activity intentionally conduct transactions through corporate structures in order to evade detection, and may layer such structures . . . across various secretive jurisdictions." *Id.* § 6402(4). Therefore, Congress found the CTA's collection of beneficial ownership information "is needed" to "protect interstate and foreign commerce," among other things. *Id.* § 6402(5).

The legislative record supports these findings. For example, as one House report found:

> Criminals have exploited State formation procedures to conceal their identities when forming corporations or limited liability companies in the United States, and have then used the newly created entities to commit crimes *affecting interstate and international commerce* such as terrorism, proliferation financing, drug and human trafficking, money laundering, tax evasion, counterfeiting, piracy, securities fraud, financial fraud, and acts of foreign corruption.

H.R. Rep. 116-227, at 2 (emphasis added). The CTA therefore addresses what "law enforcement, financial institutions, and anti-corruption organizations [consider] to be a primary obstacle to tackling financial crime in the modern era." *Id.* at 10.

### 4. Link Between Regulated Activity and the Substantial Effect

The final factor asks whether "the link between [the regulated activity] and a substantial effect on interstate commerce [is] attenuated." *Morales-de Jesus*, 372 F.3d at 14 (quoting *Morrison*, 529 U.S. at 612) (alteration in original). Having determined the regulated activity is economic or commercial in nature, the Court's role in analyzing this factor is "modest." *Raich*, 545 U.S. at 22. The Court need not decide whether the activity has a substantial effect "in fact, but only whether a 'rational basis' exists for so concluding." *Id.* "When Congress decides that the 'total incidence' of a practice poses a threat to a national market, it may regulate the entire class." *Raich*, 545 U.S. at 17.

Congress asserted a rational basis for concluding the existence of corporate entities has a substantial effect on interstate commerce. Congress found that "money launderers and others involved in commercial activity intentionally conduct transactions through corporate structures in order to evade detection, and may layer such structures . . . across various secretive jurisdictions." NDAA § 6402(4). Though surely not every one of the 2 million corporate entities formed each year is used for illicit purposes, the fact that so many corporate entities exist anonymously stymies government enforcement efforts. Illicit actors can use corporate entities to conceal themselves among other law-abiding

entities. Notably, both courts to squarely consider the aggregation issue concluded that the existence of anonymous corporate entities, in the aggregate, substantially affects interstate commerce.[15] *See Firestone*, 2024 WL 4250192, at *7; *Cmty. Ass'ns Inst.*, 2024 WL 4571412, at *7.

As Justice Holmes explained over a century ago, "commerce among the states is not a technical legal conception, but a practical one, drawn from the course of business." *Swift & Co. v. United States*, 196 U.S. 375, 398 (1905). And in the contemporary era, the course of business is dominated by corporate entities. *See* Hansmann et al., *supra*, at 1336, 1394 ("[T]he American company form evolved into a preferred means of legal organization for even small and closely held businesses."). In light of the massive role corporate entities play in the modern economy, the court readily finds a rational basis exists to conclude corporate entities' existence has a substantial effect on interstate commerce.

Therefore, Congress may regulate such entities, and the CTA is authorized by the Commerce Clause. Based on this conclusion, the Court need not reach the other potential constitutional bases for the statute.

## IV.    Ninth and Tenth Amendments

Plaintiff's Ninth and Tenth Amendment arguments rise and fall with his enumerated powers claim. "If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States." *Town*

---

[15] The courts that found the CTA likely unconstitutional declined to address the aggregation question because they found the underlying regulated activity was noneconomic in nature. *E.g.*, *Smith v. U.S. Dep't of the Treasury*, No. 24-CV-336, 2025 WL 41924, at *9 (E.D. Tex. Jan. 7, 2025) ("[B]ecause corporate formation and ownership—or the mere existence of a corporate entity—are not alone economic, their effects cannot be aggregated.").

*of Johnston v. Fed. Hous. Fin. Agency*, 765 F.3d 80, 86 (1st Cir. 2014) (quoting *New York v. United States*, 505 U.S. 144, 155–66 (1992)). Similarly, "[t]he Ninth Amendment— which stipulates that 'the enumeration in the Constitution of certain rights, shall not be construed to deny or disparage others retained by the people'—does not create substantive rights beyond those conferred by governing law." *Vega-Rodriguez v. P.R. Tel. Co.*, 110 F.3d 174, 182 (1st Cir. 1997) (quoting U.S. Const. amend. IX). Because the Commerce Clause authorizes the CTA, Plaintiff's Ninth and Tenth Amendment claims fail.

## CONCLUSION

For the foregoing reasons, I GRANT the government's motion for summary judgment and DENY Plaintiff's cross-motion for summary judgment.

SO ORDERED.

Dated this 14th day of February, 2025.

/s/ Stacey D. Neumann
U.S. DISTRICT JUDGE